United States Court of Appeals for the 11th Circuit. Hear ye, hear ye, hear ye. United States Court of Appeals for the 11th Circuit is now open according to law. God save the United States and this Honorable Court. Good morning and welcome to the last day of our oral argument session. We were all supposed to be together in Miami but obviously the virus has had other ideas for us so we're conducting this session by telephone. But Judge Pryor, Judge Branch and I are very happy that you are all with us and very grateful that you're going to assist us in figuring out these cases. Ms. Tisa is going to give you a two-minute warning when your time is running to a close and that way you'll know that it is time for you to begin to wrap up. With that we're going to start with our first case which is 19-10783 United States v. Thomas Michael White. Mr. Feigenbaum, you're on first. Welcome back and again we know your court appointed for Mr. White and we want to thank you for your service to Thank you, Your Honor. Again, my name is Marty Feigenbaum. I'm here on behalf of Appellant Tom White. Let me start with a quick overview of our position in this appeal. Every so often a case will come along which is in the category of a Kakalov or a McCarrick. Those two cases are cited many times in the papers we There's so much in this case because it was an eight-day trial and there was a lot of documents, a lot of exhibits, including exhibits that we as the defendant in the case brought to trial. In the opening statements the party drew battle lines for what the jury could expect. The government promised the nothing more than a telemarketing scheme in which my client, Tom White, lied to 13 individuals so that First Call Ventures, I might call it FCV from now on, partners could cheat them out of two million dollars of retirement funds. In contrast, I told the jurors the evidence would show that FCV was a legitimate residential moving brokerage business growing to around 100 employees. However, FCV collapsed after an NBC Today Show report broadcast nationwide told the story of a young couple who had problems when FCV failed to deliver their furniture on time. That's explained in the initial brief, page 41, and also Docket Entry 132, 17-19. One of the exhibits which Judge Bloom admitted was DX-X. That's our defense exhibit X. It's found at Docket Entry 155. It's the very revealing and I hope the panel can take that into consideration. But now, with that overview in mind, and now that the panel has the initial brief, the answer brief, reply brief, and extensive pretrial record, it's at the point where the panel will have to choose between these radically different overviews of what really happened in this case. Let me address issue four. We have four issues, but let me go right to issue four. That's sentencing error. There were a number of enhancements Judge Bloom agreed to, proposed by the government, which were not borne out by even the preponderant standard at sentencing. For example, loss amount, we argue, should not have been greater than $644,430, which corresponds to the four witnesses who appeared at trial and talked about losing their promissory note principal amount. So we argue that at, it's in paragraph 33 of the PSI, we argue that the government has its argument at its There was no evidence the government brought to trial, I'm sorry, to the sentencing hearing, where it shows that anybody else except those four people ever felt that they had a loss amount due to anything that Tom White or FTV had done wrong. You cannot speculate that the other people believe they were defrauded out of their money just because they're listed as having sent money to buy promissory notes. The second enhancement, which was responsible for a four-level increase, was substantial financial hardship of five or more victims. The government did not produce that evidence at the sentencing hearing. In fact, they agreed that witness purchaser Niles did not qualify to be one. So we were left with three others, Treat, Elliott, and Adams. That doesn't cut it. They needed five or more victims. Anything else would be speculation. Well, what did the government, you say the government didn't present any other evidence, Mr. Feigenbaum, but what did the government argue at sentencing for this enhancement? Well, the government argued that everybody who bought these notes were elderly people who had, it ties into the vulnerable victim also thing, that they were targeted, they were elderly, and they all suffered financial hardship. But there was no evidence that any of them did. In fact, Niles, who was one of the four who appeared at trial, said that he wasn't, you know, financially harmed by that. And then we argue that it kind of wraps up in our reply brief after we got the government's answer brief at pages 30 to 32 in our reply brief. So the government had the burden, it's an aggravating factor, and they didn't do that to get beyond, even in the light most favorable to the government, even those four levels were asking to be removed from the guidelines calculation. Regarding the loss amount, the government said the loss amount was, again, like 1.9 million dollars, but they never did anything except speculate whether the balance of the people were defrauded. Remember here, there's a difference between a scheme to defraud and a scheme to do something else, like lie. The government's entire case was really grounded in, and in the light most favorable to the government, in a scheme to lie, that John Reach, who was in the investor department at SCV, he told people that the company was doing very well, it was profitable, and so forth. But this was, in the light most favorable to the government, a scheme to lie, not to defraud. There's no evidence at all in the entire record of this case that Tom White or anybody else at SCV intended to defraud, in other words, propose a bargain with the intent to harm the people who bought these notes. Counsel, this is Lisa Branch. So, the district court found that the loss amount was, what, roughly 1.9 million, which was the entire amount of the principal invested in SCV by the investors. Isn't your argument right now as to the loss amount, just as the government has said in their brief, that it's a rehash of your sufficiency claim, which goes against the verdict? Well, Your Honor, I would say that when the jury found Tom White guilty, it didn't do that as to each of the persons who purchased these promissory notes. In other words, it wasn't asked as to a particular investor, were they defrauded. The jury would have to come back and say no, as to everybody in that list of 1.9 million who never appeared in trial. There was no evidence from any of them. Counsel, two minutes, two minutes, please. Thank you. There's no evidence from any of those other people who didn't come to trial that any of them didn't accept the risks that were in the offering materials, that they were told anything which was untrue, that they were lied to. There's nothing there about all those other people. So, the mere fact that they send in money and get a promissory note in exchange shows nothing more than that. It doesn't show any loss to them for any improper reason. So, for that reason, it would be speculation. We don't know what happened with all of those other people because they didn't come to trial. There weren't even, you know, there weren't even attempts to say what was told to any of them. The offering materials by SCV were very clear and they were legally compliant. They all told about the risk that people could lose all or part of their investment. All of the investors had to be accredited, except I think it was Adams. And, you know, to put something in the case that's not there, that wasn't proved by the government, as to sufficiency, which you're correct, Judge, goes to this particular issue as well, it's just plain wrong. That's why I'm starting with sentencing because there has to be enhancements. I see my time is up, so I will I will stop talking now. All right, thank you very much. Mr. Cruz. Yes, good morning, Your Honors. May it please the court, this is Roger Cruz on behalf of the United States. Now, the evidence in this matter showed at trial that Tom White's orchestrated a sophisticated fraud scheme. More importantly, for purposes of this oral argument, I'd like to turn to Anderson v. City of Bessemer City, Supreme Court of the United States, quote, where there are two permissible views of the evidence, the fact finder's choice between them cannot be clearly erroneous. And, Judge, in this case, as Mr. Fagenbaum pointed, the parties did have, at the beginning of the honor's job, according to 11th Circuit case law, states simply that it is not enough for the defendant to put forth a reasonable hypothesis of innocence, which is what the defense wants you to do. And the issue is not whether a jury reasonably could have acquitted, but it's whether they reasonably could have found guilt beyond a reasonable doubt. Judge, in this case, we have Tom White, who maneuvered, until the very end, a ripoff. This was a Ponzi scheme by his design. It was set up by him to benefit him personally to fleece nearly two million dollars from these victims. He personally profited over $850,000, which the record clearly shows. The extensive trial record, including White's own testimony, supports what the jury found, and that's that White was guilty of his investment fraud scheme. He harmed over a dozen individuals, and this court should affirm his convictions and sentence. The record amply supports it. It amply supports his intent to defraud. This was not a tackle-off type matter, and if you look at the record, there was no jury instruction. It was actually, at the very end, withdrawn by the defense. They did not ask and seek an actual tackle-off, because I think they saw what Judge Bloom had ruled initially, which was the mail-and-wire fraud and conspiracy pattern, amply supported and captured what the government's allegations and what the evidence showed. If we could turn to some of the sentencing issues that Mr. White has raised, Mr. Feigenbaum says that you did not, and I haven't gone into the actual questions, but I'm asking this question. Mr. Feigenbaum says that you, the government, did not present any evidence with regard to the number of victims who sustained a substantial financial hardship, and as a result, that enhancement was not warranted. Can you talk about that, please? Judge, Mr. White's contention, Mr. Feigenbaum's contention, is absolutely wrong. I'm looking at docket entry 206. It's the sentencing transcript, and beginning on page 53, for several pages, the government is put to the test of proving beyond, or excuse me, by a preponderance of the evidence that there were sufficient individuals that were defrauded, and in fact, received a substantial financial hardship. We went through in detail, outlining by name, those individuals, and certainly some of those individuals did testify at trial, but on top of that, we were able to prove at the sentencing hearing, and satisfy Judge Bloom's analysis, which was in fact more than five individuals suffering the financial hardship. How did the government prove that? By a mix of methods, Judge. Mainly, we focused on the trial record, which was Mary J. Adams's deposition transcript, in that she suffered financial hardship. She was the most devastated, in fact. She was living on food stamps, had assisted government subsidies for energy. The woman gave Tom White and his co-conspirators a large chunk of her retirement funds, and she testified in trial that she had suffered financial hardship, and Judge Bloom supported her as one of those individuals. The other two of them, Linda Elliot, testified at trial, and she, again, at trial testified that she's suffered financial hardship from this. She mortgaged her home, she took on another job at a church, she had two jobs based on this direct harm that this defendant and his co-conspirators caused. That's two, but we didn't stop there, Your Honor. At the sentencing hearing, we relied, again, on other individuals that testified at trial, coupled with the agent who was seated to my right, relying and relaying to Judge Bloom his interviews, and yes, hearsay was provided, but again, as we know, hearsay is allowed at sentencing hearings, as long as it's reliable and otherwise proven to be supported, and Judge Bloom accepted the agent's testimony of these other individuals. So, Judge, I'd ask that you look at the sentencing transcript to support the fact that we had more than five. We were able to prove beyond a How many individuals, if I could ask you this, how many individuals did the agent testify about? I believe the agent supplemented with a total of two or three, Your Honor, but again... Because you needed five, right? Yes, Judge, and Judge Bloom specifically held that there were over five and that we met our burden over five. I think, if I'm not mistaken, the record supports seven. All right, thank you. Yes, Your Honor. So, Judge, I started with the two different theories because of the Takloff, and I see that Mr. Fagenbaum is also attacking the lost amount. If you'd like me to address that, I don't believe we need to... I should spend too much time, essentially, based on the fact that he's claiming that our loss should only be tied to the individuals that testified at trial. That's clearly not the case law, which is clearly the opposite. The district court judge can, in fact, rely on not only direct testimony, but she merely needs to make a reasonable estimate of that loss. That reasonable estimate of the loss was proven through several means, but if you'd like one particular piece of evidence, Government Exhibit 13-AF encapsulates the total loss of the case. I want to remind Your Honors that this was a rip-off from the beginning. John Reach testified that he had conversations with White about the extent of the fraud scheme, and it was hatched at the inception. This company was bleeding money, to use White's own words, with Reach from the inception, and the crux of the fraud scheme involved making sure that they raise as much money as they could and then leave these victims with their proverbial bag. Bag full of emptiness is, of course, what the evidence showed and what the jury accepted. Now, the initial business, although it ultimately was failing at the end, the initial business was not a sham, right? It was a legitimate company providing a legitimate service, although maybe not making money at the end, right? Judge, I take issue with any legitimacy label given to this business. Again, at the very beginning? At the very beginning, Judge. I would submit to Your Honors to look at the record and the testimony of one John Reach, as well as Goldstein in the recordings, in which we were able to show that at the inception, at the inception of this case, at this moving venture, it was to, instead of providing legitimate services, using those what appeared to be legitimate services to steal money from victims. That's the cookie-cutter, as to use the words of John Reach, who testified. Again, to remind the panel, John Reach is the co-defendant who pled guilty and testified against White, and in this case, he testified that the cookie-cutter method was to open up these call rooms to have a widget, which in this case was this moving service, that appeared to be legitimate, to raise as much money from investors, and to fleece them, and then shut it down and open up another one. That's what John Reach testified about. That's what Goldstein, under 404B, and inextricably intertwined, as well as some sprinkling of first-call ventures in his recordings showed. It was a pattern, it was a motive, and that's why Judge Bloom allowed the recordings to demonstrate Tom White had, from an inception of first-call ventures, the plan, the motive, and the pattern of stealing a victim's money through these what appeared to be legitimate businesses. So no, Your Honor, I disagree. I do not believe this business was legitimate from its inception. I believe the bookends, if you will, of beginning and end, show that the plan was to have a business that appeared to be legitimate, but in fact was a sham. As far as the rest of the enhancements, Your Honors, the targeting of elderly, as well as the fact that these individuals were susceptible to loading and reloading, I would rely on the government's brief. We cited a case that stands for the proposition that when a phone room and an offering fraud such as this perpetually targets individuals and asks them to reinvest, especially when they're elderly, the actual enhancement for the vulnerable victim sentencing enhancement is applicable. That's where Judge Bloom found that there was a sufficient evidentiary basis at trial, and she supported, again, Your Honors, if you were to look at the sentencing transcript, she did, in fact, thoroughly apply the facts at trial to this four-point enhancement. As to the remainder of the appellant's requested relief, Your Honors, there's simply no reversible error here, and unless Your Honors have any further questions for me, I'd be happy to entertain them, but we would ask that the government respectfully request that you affirm Tom White's convictions plural and his sentence. All right, thank you very much, Mr. Cruz. Thank you, Your Honor. I didn't catch that. I was saying my line was unmuted. Are you ready for me, Judge Jordan? Yes, go right ahead whenever you're ready, Mr. Feigenbaum. Thank you, Judge. Well, let me also just mention that I didn't hit the organizer leader enhancement before, and that was, you know, four levels, and we're asking that that be removed because the government had to find that there were five or more participants in the criminal activity at the sentencing hearing because the government completely failed in its burden to prove by a preponderance any of those enhancements, including organizer leader. There were two persons, Genzone and Reach, who were named as co-defendants in the case who pled guilty, but the other three people the government tried to put in there, Kipnis, Markowitz, and Itaw, there was no evidence that the government presented at the sentencing hearing showing those additional three people were participants in the criminal activity. So we're asking that that enhancement for four levels be taken off. That puts putting obstruction of justice aside, which is carefully explained in our papers, that would bring it down to 23. It would bring it down, the total offense level, down to 21 if you keep the obstruction of justice, but that substantially reduces the advisory guidelines for Mr. White, and we're asking that the court apply in a remand for recalculation of the guidelines correctly that the court give the instruction under United States v. Washington, 714, Feb 3rd, 1358, at page 1362, 11th Circuit case from 2013, that the government not be allowed to try to relitigate any of the enhancements that they didn't bring the evidence during the original sentencing hearing. Now, getting to the overview again that Mr. Cruz gave, this really, I must tell the panel, this is really troubling to me because in the briefs, in the exhibits that were presented at trial, and in the witness testimony, there is, of course I'm an advocate for my client and feel so strongly having been in the trial, that this was a legitimate company. We brought witnesses who worked there. This was not some kind of a boiler room or a fraud room. We brought a guy who was in charge of the call center for a while named Mark Goodman. You can find this in the initial brief starting, you know, we go through the witnesses starting at page five and we give a summary of their testimony, but at page nine you have Mark Goodman who, you know, he's a former Army Ranger and he was working for the State Department at the time we brought him to classes overseas. We brought the CPA who did the tax returns for First Call Ventures and he talked about but for, but for the Today Show report in August of 2013, where it triggered massive chargebacks and refunds from people who had placed orders to do the moving, the company would have made one million dollars at least in 2013. That's what they were on track to do, from sales of residential moves. To give the impression in light of all of the witnesses that we brought, including an IT guy from First Call Ventures who set up the computer and the software system and all that stuff, named Ivan Gestaldo, we of course in our initial brief go through his testimony, is just absolutely, it's like, it's not even the same case. So I know I sound passionate about this, but I'm so concerned that an injustice is going to happen. This case is like Takaloff and McCarrick. There's something fundamentally wrong with finding that Tom White should stand convicted of these crimes. This was a real company with real people growing by leaps and bounds. We document it all. We have exhibits that the government did not object to. The government did not go out and find the CPA for the company. The government had nothing to dispute the figures from the company. People made a bargain. Investors, when they bought promissory notes, they made a bargain. They said, we're going to give you this money, we get 18% interest, but you have to use the proceeds to build the company. And in our brief, you'll see that we talk about what were the use of the proceeds, what was in the term sheet that First they did it all. And when you look at the tax returns, which are part of our exhibits, admitted at trial, the tax returns, the profit and loss statements, all show that these things were done. Many employees hired, big payroll, software expense, computer expense, all these things. This company was booking something like 1,100 and 1,200 residential moves per month. This was a that was in the record at docket entry 138, pages 7 to 11. I'm sorry, 37, well, many pages. But just take a look at the day three, I believe it is, where we have the testimony of Mark Goodman. We have the testimony of Robert Manello, the CPA. And then on another day, we have the testimony of the IT guy. So this company failed because of one and only one thing. It was the Today Show nationwide transmission of that report, where one couple didn't get their furniture. And it's devastating when you see that tape. People who saw that, they canceled their orders, they caused a cash crunch for the company, and the company folded soon thereafter. It was nothing to do with any scheme to defraud. This company was built up from scratch, and it did a great job. I don't want to exceed my time, but I urge the panel not only to remove these enhancements, which were not supported at sentencing, but please also to consider that this is the next case in the line of Takalov and Matera. Thank you so much. All right, thank you both.